The Case is stated in the opinion of the court which was delivered by
Mr. Justice Hagker.
This is an application by William W. Warden for a mandamus to the Secretary of the Navy to compel him to carry into effect a provision contained in the Sundry Civil Appropriation bill, chapter 133, approved March 3, 1881, in the following words : “ To enable the Secretary of the Navy to establish at the Isthmus of Panama naval stations and depots of coal for the supply of steamships of war, $200,000, to be available for expenditure as soon as suitable arrangements can be made to the proposed end.”
The petition is very lengthy, and professes to set forth in *528 detail the history of the action, legislative and executive, of the Government, for many years past, with respect to the location on property claimed by the Chiriqui Improvement Company, on the Isthmus of Panama, of naval stations and depots of coal. It states that in 1859, movements in this direction were commenced under the adminstration of President Buchanan ; that the minister plenipotentiary from New Grenada directed the attention of President Buchanan to-the Chiriqui lagoon and the harbors and property situated thereon as especially adapted for that purpose ; that the-President, in consequence of these representations, directed the Secretary of the Navy to take suitable action to secure to the United States the use of these harbors, and the then Attorney-General examined the title of the company to the lands, &c., and made a -favorable report on the subject; that the Secretary of the Navy, in May, 1859, entered into a written agreement with the Chiriqui Improvement Company, subject to ratification by Congress, to secure the right to use these harbors, &c., for which the company was to receive $300,000, and that this agreement was approved by the government of the United States of Colombia ; that the Secretary of the Navy transmitted this contract to Congress for approval, and a bill was reported by the Committee on Naval Affairs to carry out the contract, and a preliminary appropriation of $10,000 was made to enable the President to send some competent person to the Isthmus of Panama to examine and report as to the probable quantity of coal to be found there, upon the lands of the company, and the character of the harbors, and generally upon the value of the privileges contracted for ; that the President appointed a commission of officers of the army and navy, who repaired to Chiriqui, and returned in November, 1860, and submitted a report to the Secretary, showing the value of the harbors, &e., which was sent to Congress by President Buchanan, in January, 1861; that owing to the disturbed condition of the country at that time, and for other reasons, Congress took no action in reference to the subject at that session; that in July, 1862, an act was passed *529 appropriating a sum of money and authorizing the President to make provision for the transportation and colonization in some tropical country of such persons of the African race-made free by the provisions of that act as might be willing to emigrate, and that President Lincoln selected the afore- ' said Ohiriqui property as the most suitable for said colonization purposes ; that by direction of the Secretary of the Treasury upon request of the President, the solicitor of the Treasury, Mr. Jordan, made a thorough investigation of the harbors, &c., and the title of the company to the lands, and reported in detail that the title of the company was perfect, and that the harbors, climate and agricultural products were all of the most desirable character ; that thereupon the President, through the Secretary of the Interior, in September, 1862, entered into a contract with the company for the purchase of part of its lands in Ohiriqui, upon which to settle and colonise the freedmen ; but that soon thereafter a new policy with reference to persons of the African race was decided upon, and nothing further was done upon the subject; that the said contracts made by the administrations of Presidents Buchanan and Lincoln remained in abeyance until an early period during the administration of President Grant, when they were brought before the President for consideration, and were referred by the President to the Attorney-General for examination, especially with reference to the proposed naval stations and coaling depots ; but the papers in the case • did not reach the Attorney General, having been mislaid, and were not found until a few days before the close of President Grant’s administration.
That at an early period of the administration"of President Hayes, the subject was taken into consideration, and in January, 1880, a select committee of the House reported a resolution favoring immediate action by the Government, with a view to obtaining title to the Ohiriqui property; that in conformity with that resolution, the Secretary of the Navy despatched vessels to different points, on both sides of the isthmus, which took possession of the harbors and lands ©f the company on the Pacific and Gulf coasts, and the *530 Government has ever since continued in possession, in accordance with the agreement between the Secretary of the Navy and the Company in 1859 ; that in the same year, the Secretary of the Navy, in his annual report, stated that he had caused steps to be taken for the establishment of coaling stations on each side of the isthmus, at suitable points, the one at Chiriqui in the Caribbean Sea, and the other on the Pacific, at a distance of less than a hundred miles apart; that these were the only safe and sufficiently commodious harbors on the isthmus, “and although the Department did not, before making the deposits of coal, acquire title to the lauds occupied, yet it assured itself that no difficulty would be likely to arise on that score ; ” and that the President, in his annual message in December, following, confirmed this statement of the Secretary. It further states that the President and the then Secretary of the Navy, Mr. Goff, examined the matter in all its aspects, and thereupon an agreement was made between those officers on behalf of the United States on the one part, and the petitioner, as attorney of the Company, on the other, whereby, besides-other considerations, the sum of $200,000 was to be paid to the owners for the aforesaid lands and other privileges for naval stations, &c., a part of which property the Government had already taken possession of, provided Congress should make the necessary appropriation therefor; that in February, 1881, in order to consummate the agreement and complete the establishment of the naval stations, the President sent a special message to the House, recommending the appropriation, and transmitting a letter from the Secretary of the Navy, describing the property in possession óf the Government, and stating that, in order to proceed further towards the establishment of the stations, an appropriation of $200,-000 was requisite ; that this special message was referred to the Committee on Naval Affairs, by it_unanimously approved, and an amendment proposed to the Sundry Civil Bill, which is the paragraph herein already quoted, appropriating $200,-000; that throughout the debate on the subject, the property of the company was that which was solely in the minds *531 of the members of the House, and that the appropriation was designed for the purpose of acquiring that property, and none other, and that the act was subsequently approved by the President, on the 3rd of March, 1881; that on the next day, Mr. Garfield became President, and Mr. Hunt was subsequently appointed Secretary of the Navy; that the matter of this appropriation was soon afterwards brought to the attention of Mr. Hunt and the subjects thoroughly discussed with him by the petitioner, as attorney, as aforesaid. The petition then states that Secretary Hunt, in his annual report of November, 1881, made mention of the Chiriqui project in the following terms :
“ Coaling Stations on the Isthmus oe Panama.”
“In the act of Congress making appropriations for sundry civil expenses of the government for the fiscal year, ending June 30, 1882, and approved March 3, 1881, the sum of §200,000 was appropriated Go enable the Secretary of the Navy to establish at the Isthmus of Panama naval stations and depots for coal, for the supply of steamships of war, to be available for expenditure as soon as suitable arrangements can be made to the proposed end.’
“ Constantly, since the passage of this act, the department has been importuned to expend the sum here appropriated in acquiring title to certain rights upon'the isthmus, claimed to belong to Ambrose W. Thompson, as the representative of a corporation styling itself the Chiriqui Improvement Company. The appropriation seems to have been granted in pursuance of the recommendation of the Hon. N. Goff, jr., Secretary of the Navy, in a report made by him to President Hayes, under date of January 19, 1881. This report was submitted by President Hayes,in a message to the House of Representatives, dated February 2,1881. It is evident that the report of the Secretary of the Navy, and the message of the President contemplated the establishment of the naval stations and depots claimed to belong to the Chiriqui Improvement Company, and Ambrose W. Thompson. Indeed, the Hon. R. W. Thompson, Secretary of the Navy, in his *532 report, under date November 30,1880, states that he had * caused coal to be deposited in small quantities on these lands for use by our vessels whenever it may be needed.’ This step was taken with a view to acquiring title to these lands by our Government. The appropriation, however, ■seems to have carefully avoided all mention of the selection ■of these lands, or of any other specific lands for the contemplated coal stations. Under the general instructions of this .authorization I have been unable to satisfy myself that the interests of the Government will be advanced by the payment of this sum, or any portion of it, for the grant represented by Mr. Thompson.' From reports made to the •department from reliable sources, since the passage of the appropriation and before, I am not satisfied that the lands and harbors known as the Chiriqui grant are the best adapted for coal stations. Several parties claim to be owners of the grant which Mr. Thompson asserts belongs entirely to him and his company. It is also urged that the title of Mr. Thompson and the company is' not valid; that it rested originally upon a grant conferred by the United States of Colombia under certain conditions, which have not been ■complied with by the grantees; that such coaling stations would result in a useless expenditure of money, involving large expense to the Government in the maintenance of the ■stations, and probably resulting in their abandonment as being in an expensive, isolated, inconvenient and unhealthy position. The sovereignty over these lands has undergone changes since the date of the original contract; and it is by no means certain that the obligations said to be conferred under that contract will be ratified and held valid by the government now in power there. It is further reported that land in this lagoon is almost valueless, and that any one settling there and cultivating it acquires title by mere possession. For these and other reasons, I have declined to treat for the lands offered by Mr. Ambrose W. Thompson and the corporation in whose name he acts.”
The petitioner then .proceeds to complain, upon various grounds, of the action of Secretary Hunt, and states that he *533 applied for a re-examination of the matter, but without success ; and narrates certain proceedings in the House of Representatives, by which the secretary was called upon to furnish the particulars of the statements set forth in his said, report; and in the 51st paragraph of the petition, it is stated that on the advent to office of the present Secretary, Mr. Chandler, the petitioner called his attention to the subject anew, and requested him to carry into effect the act of Congress in the manner which the petitioner considers it should have been carried out by Mr. Hunt, and received from him, in June, 1883, a letter, in which the Secretary states : “In reply to your letter of the 23d inst., asking to be informed as to my decision relative to the act of March 3,1881, appropriating $200,000 to enable the Secretary of the Navy to establish at the Isthmus of Panama naval stations and depots of coal, &c., I have to say that the decision is not to revise the determination of Secretary Hunt not to expend the appropriation, but to submit the whole subject to Congress at its session in December.” And to the petitioner’s additional request that the matter should be referred to the Attorney General for examination, Secretary Chandler made written answer, refusing to make that reference.
The petition then claims that the company has done all In its power to carry out the contracts before referred to, and is willing to do whatever else is necessary in the premises, and that it is entitled to receive payment of the money, and that this court should award a mandamus commanding the Secretary to make such payment.
I have thought it proper to recite the averments of the petition at this length, that the grounds of our decision •should be more fully understood.
To this tribunal alone, of all the circuit courts of the United States, is entrusted the power to grant writs of mam •damus to the executive officers of the Government. The fact that this exceptional power is vested here alone, admonishes us that it should be exercised with great circumspection. The general rule in applications for mandamus, is that the writ should be granted with caution, and this rule *534 should be applied with increased force in cases like the present, where this extraordinary power is invoked to direct high officers of the Government in the discharge of important official duties.
As matter of practice, we remind counsel that, by our 18th rule, all petitions for mandamus are required to be presented to a judge in Special Term, or in chambers, when the case can afterwards be certified here. That course was not observed in the present case, but the petition was filed in the General Term. In the examination of the questions presented, however, we shall assume that the proper formalities have' been observed, and consider the case as though certified here by one of the judges present.
It .seems to be supposed by the relator, that the rule requiring the defendant to show cause why the writ should not issue, is granted as of course upon the filing of the petition for mandamus. That this course is very generally adopted,, is true, because usually the petition shows on its face a strong prima facie case, and without disclosing full the ground upon which the officer refuses to act; but the practice is not uniform, as in the case of habeas corpus, where the issue of the writ almost universally follows the filing of the petition. In applications for mandamus the court, in the exercisé of its ¡discretion, will refuse the preliminary order, if the petition itself shows that further proceedings would be a waste of time and would ultimately prove futile. In the case-before us the petition sets forth, in the letter from the Secretary of the Navy, the ground upon which he bases his refusal to act in the manner inquired by the petitioner. He could say no more, and need say nothing else, if he were compelled to make answer to the petition at length. And if the grounds of that refusal, upon examination appear sufficient, there could be no excuse for prolonging the litigation by requiring an answer to an application that cannot stand of its own strength.
Before this court will award a mandamus againt an executive officer it must be made to appear in the proceedings :
*535 1st. That the party applying has a clear legal right to the relief he claims, which he cannot obtain by any other proceeding ;
2d. That there exists a clear legal duty on the part of the official against whom the right is asked, which he refuses to perform ; and — •
3d. That the duty which is thus claimed and imposed is one ministerial in its character and in no degree discretionary.
Does the petition in this case disclose the existence of these essential prerequisites to the issuing of the writ ?
As to the title of the relator to the relief claimed. He seems to base his right to sustain this suit upon three grounds:
He alleges he is a member of the bar of this court and of the Supreme Court of the United States. Of course that circumstance could give him no special title to sue in this matter.
Next, he claims, in section 24 of his petition, that he is “ the attorney and counsellor for the Chiriqui Improvement Company.” As attorney and counsel for this company, he can have no right to make this application, as such actions must be brought in the name of the owner of the thing, claimed, who alone can be recognized as the claimant. But this relator may not be the only counsel for this company. There may be others of equal or greater authority ; and although he may be their counsel to-day, his place may be occupied to-morrow by others. But upon plain general principles, it is impossible that there can be such a communication of title, or power to a mere attorney and counsel, as can authorize him to assume the place of the principal, of Ms own motion, and conduct a litigation like this in his own behalf.
Finally, he avers that he has, individually, a vested interest m the Chiriqui property, and in the $200,000 ; that his interests and those of the company are harmonious, and his obligations to the company and others require that he shall prosecute the claim to final disposition. But it is not *536 claimed that his interest amounts to the $200,000, and such assumed right to claim a portion of the sum from the company when received by it, can give him no authority, to the exclusion of all other claimants similarly circumstauced, to use the name of the United States in an application to the court to dispose of the whole amount. We might rest our refusal to issue the writ upon this manifest lack, of title in the petitioner to sue, for the case is really disposed of when the petitioner fails to show in himself that clear legal right in the thing claimed which the law of the subject requires.
But supposing this difficulty to be waived, and that the company itself were here as petitioner. Let us see whether the petition presents such a clear legal right in the company, and such a clear ministerial duty on the part of the Secretary of the Navy, which he refuses to perform, as would justify us in issuing the writ.
The petitioner insists that the Secretary, in the face of the action of his predecessor, and of his own refusal, shall be commanded to pay over this $200,000 to the Chiriqui company. The enactment simply says that the appropriation is made to enable the Secretary of the Navy to establish stations and depots for coal “ at the Isthmus of Panama.” The only requirement as to the location of the proposed stations and depots, is that they shall be “ at ” that Isthmus. This tract of country, including the territory formerly known as the Isthmus of Darien, is more than 400 miles in length,' and the possessions claimed by the Chiriqui company lie near its northern extremity. No particular point along this extensive line of coast was indicated by Congress, and, in the absence of such a designation, the act necessarily devolved the selection of the site upon the officer who was charged with the expenditure of the money. The omission to designate the locality by Congress, could not have been accidental, or because of want of knowledge of the place. The lagoon bearing this name was discovered by Columbus in his last voyage, 370 years ago this month, and near by he is said to have founded a settlement, which soon melted away before the pestilential climate then existing there. Indeed, it is *537 strenuously insisted by the petitioner, that Congress knew all about the property, as indicating that it intended the money should be expended there. If such is the case, it is astonishing that the requirement was not inserted in the act; for this omission under the circumstances, seem to be especially indicative of a purpose on the part of Congress to leave the Secretary entirely unembarrassed in making his ■choice of location, whether near the railroad, or the proposed ■canal, or at whatever other position he should determine most convenient and salubrious : and Secretary Hunt, in deciding not to select-Chiriqui, was but exercising the plain power of choice undoubtedly confided to his sound discretion by Congress in the act.
The paragraph contains the further provision that this money is " to be available for expenditure as soon as suitable arrangements can be made to the proposed end.”
We look in vain through the petition for the proof that these suitable arrangements had been .made. Was it designed by Congress that there should be a purchase of land ■on the isthmus by the United States ? From the debates in the House of Representatives, incorporated in the petition, it appears that one of the members of the House, Mr. Blount, took exception to the proposed appropriation, on the ground that it might involve the acquisition of land by the Government. In reply, Mr. Goode, of the naval committee, having charge of the amendment, answered : “ The purpose is to do identically what the President of the United States and the Secretary of the Navy have recommended.” This reply does not. seem to answer the inquiry in a very satisfactory way, and certainly the purpose was left in entire uncertainty by the language of the act itself. If a purchase was intended, the Secretary would be powerless to cany that purpose into effect, except in subjection to the positive directions of the public statutes of the United States governing the acquisition of land by the Government. By section 8736 of the Revised Statutes of the United States it is declared that “ no land shall be purchased on account of the United States except under a law authorizing *538 such purchase.” If, however, the Secretary, in the face of this explicit declaration, should have considered himself obliged to consider the paragraph making the appropriation as commanding him to purchase these lands in a foreign country from parties whose title, as Secretary Hunt says, was denounced as worthless by individuals apparently equally entitled to credence, he would then be obliged to conform to the provisions of section 355 of the Kevised Statutes, which declares that, “ No public money shall be expended upon any site or land purchased by the United States for the purposes of erecting thereon any armory, arsenal, fort, fortification, navy yard, custom house, light house, or other public building, of any kind whatever, until the written opinion of the Attorney-General shall be had in favor of the validity of the title.” The section further requires that the preliminary consent of the legislature of the State shall be given ; that the district attorneys of the United States, upon the application of the Attorney-General, shall furnish all assistance or information in relation to the title ; and that the secretaries of the department, upon the application of the Attorney-General, shall procure any additional evidence of title deemed necessary. And since these precautions are thus properly enjoined where property is to be acquired which lies within our own territory and subject to our own laws, a multo fortiori should the spirit of caution they inculcate be observed where it is proposed to enter upon the novel experiment of purchasing territory within the dominion of a foreign government, and especially of one as subject to civil disturbance as its coasts are to convulsions of nature. It seems to us that the Secretary would have been justly censurable if he had parted with a dollar of the appropriation until the spirit, at least, of these wise laws had been complied with, so that he might be assured that he would not be practically throwing the public money into the sea, while perhaps involving the country in grave political complications like those that threatened the public peace after the affair in this neighborhood at Greytown. The petition nowhere discloses that any such examination of title to the Chiriqui property had been *539 made or reported to the Secretary by the Attorney-General. Indeed, the absence of such report is admitted, and is charged as due to the neglect or improper conduct of the Secretary. The alleged examination by Attorney-General Black, during the administration of President Buchanan, had reference to a different project, which, on its face, was to be of no vitality or force without the subsequent approval of Congress, and this was never given. The only examination of the title claimed ever to have been made, was one said to have been conducted by the Solicitor of the Treasury. But this officer had no authority under the statutes to make the examination, which is required to be made by the Attorney-General. The position of the heads of departments, if they were obliged, positively, where an act of this character was presented to .them, to apply the money against their better judgment in all such cases, would be most unfortunate. "We know perfectly well that they are not expected to administer their departments in that way, but that they frequently and properly exercise a sound discretion before proceeding to act. On the same page of the statute book, which contains the appropriation of the $200,000 in question, is to be found an appropriation for the purchase of a suitable site in the city of "Washington for the erection of a fire-proof building for the Pension Bureau. But we know, as a fact, that the Secretary of the Interior made no such purchase, for from these windows we can see. the building in course of erection on a public reservation. It may well be that individuals in the city, who offered their property to the Secretary of the Interior as affording a suitable site for that building, may have been inconvenienced and prevented from selling to others, because, as they supposed, they had made a favorable impression upon the Secretary, and were persuaded they would probably sell their property to the Government. But the Secretary saw fit to withhold the expenditure of the money until the meeting of the next Congress, when this provision was repealed, and the Secretary of the Interior was directed to cause the structure to be built on a designated public reservation, if it should be found suitable for the pur *540 pose, and, if not, on any other appropriate public reservation. And, as evincing the caution of Congress with reference to the security of titles to land upon which public buildings-are to be erected, this last act of chapter 433 of the 47th Gongress contains the proviso, “ that the Attorney-General shall approve the title of the United States thereto,” although the site contemplated was one of the Government reservations.
In our judgment, the decision of Mr. Secretary Hunt seems to have been a wise and proper one ; but certainly it was one which, under the discretion confided to him by a fair construction of the statutes, he was perfectly justified in makings
The application here, then, is effectively to compel the present Secretary of the Navy to revise the previous decision of his predecessor in a matter entrusted to his discretion» In our judgment, this court is without authority to grant such relief.
Without consuming time in referring to other decisions, it is sufficient to cite the case of Decatur vs. Paulding, 14 Peters, p. 497. By the act of Congress of March 3,1837, the widow of any officer who died in the naval service was entitled to receive out of the Naval Pension Fund a certain proportion of the monthly pay of her deceased husband. On the same day a resolution was passed by Congress declaring that the widow of the late Commodore Decatur should be paid from the naval fund a pension for five years, at a greater rate than that allowed by the general law. After the passage of the law and resolution, Mrs. Decatur applied to the Secretary of the Navy, Mr. Dickerson, to be allowed the half pay given to her by the resolution, as well as the pension provided by the general law. The Secretary, after taking the opinion of the Attorney-General, decided that she might claim the one or the other, but not both. After Mr. Dickerson retired from office, Mrs. Decatur applied to his successor, Mr. Paulding, to revise the decision of his predecessor, / and allow her both pensions. This the Secretary declined to do} and Mrs. Decatur applied to the Circuit Court of this District for a mandamus to compel the payment of the *541 additional sum. The application was refused, and the case went to the Supreme Court. Mr. Chief Justice Taney delivered the opinion of the court, which affirmed the decision of the court below. In his opinion he says :
“ The first question, therefore, to be considered in this case, is, whether the duty imposed upon the Secretary of the Navy, by the resolution in favor of Mrs. Decatur, was a mere ministerial act. The duty required by the resolution was to be performed by him as the head of one of the executive departments of the Government, in the ordinary discharge of his official duties. In gen eral, such duties, whether imposed by act of Congress or by resolution, are not mere ministerial duties. The head of an executive department of the Government, in the administration of the various and important concerns of his office, is continually required to exercise judgment and discretion. He must exercise his judgment in expounding the laws and resolutions of Congress under which he is from time to time required to act. * * * *
“ If a suit should come before this court, which involved the construction of any of these laws, the court certainly would not be bound to adopt the construction given by the head of a department. And if they supposed his decisions to be wrong, they would, of course, so pronounce their judgment. But their judgment upon the construction of a law must be given in a case in'which they have jurisdiction, and in which it is their duty to interpret the act of Congress, in order to ascertain the rights of the parties in the cause before them. The court could not entertain an appeal from the decision of one of the Secretaries, nor revise his judgment in any case where the law authorized him to exercise discretion or judgment. Nor can it by mandamus, act directly upon the officer, and guide and control his judgment or discretion in the matters committed to his care, in the ordinary discharge of his official duties.
“ The case before us illustrates these principles and shows the difference between executive duties and ministerial acts. The claim of Mrs. Decatur having been acted upon by his predecessor in office, the Secretary was obliged to determine *542 whether it was proper to revise that decision. If he had determined to revise it, he must have exercised his judgment upon the construction of the law and the resolution, and have made .up his mind whether she was entitled under one only or under both. And if he determined that she was entitled under the resolution as well as the law, he must then have again exercised his judgment, in deciding whether the half pay allowed her was to be calculated by the pay proper, or the pay and emoluments of an officer of the Commodore’s rank. * * * A resolution of Congress requiring the exercise of so much judgment and investigation, can, with no propriety, be said to command a mere ministerial act to be done by the Secretary.”
So, in the present case, we think the question presented to Mr. Chandler, as to whether he would revise the previous action of his predecessor, was in itself a matter addressed to his discretion ; and that the previous decision of Mr. Secretary Hunt, in like manner, was based upon a subject confided to his official discretion. We, therefore, think that it is beyond our competency to interfere in the manner proposed.
There is another matter which appears from the petition, and which may well be noticed as of importance in this connection. It seems that at the session of Congress following the passage-of this act, in July, 1872, the Naval Committee submitted a report on this subject, in which they considered the question whether it would be expedient that the appropriation now before us should be repealed ; and their conclusion is expressed in these words: “The committee, upon an examination of the subject, do not discover any reason why the power now vested by law in the Secretary of the Navy over the subject of the purchase of coaling stations on the Isthmus should be withdrawn. Se is not likely to purchase them unless they are required by sound public policy, nor until a perfect title can be secured.” This is addioual evidence of the continued caution which Congress as well in the report of this committee, as in the statutes before cited, has constantly endeavored to impress upon the executive officers whenever the subject of the purchase of lands is involved.
*543 But the petition earnestly insists that an exceptional feature presents itself in this case, which calls for the interference •of this court in the manner desired; and that consists in the reiterated assertion in different forms that the duty devolved upon Secretary Hunt by Congress was not discharged by him with sufficient promptness or intelligence, or with proper good faith, and therefore it should be regarded as if it had never been performed at all. It is averred, in the first place, that he was most reluctant to examine the case ; that when at last he yielded to repeated importunities, he only considered it “ cursorily,” and in an imperfect and perfunctory manner ; that, although he assumed to hear the arguments of the petitioner, he paid no manner of attention to them; that his disposition of the case was marked by ignorance and prejudice ; that he evidenced a willingness to listen to ■blackmailers and other irresponsible and unworthy persons, who were interested in misrepresenting the honest title of the Chiriqui company ; that his report on the subject to •Congress was filled with inaccuracies of statement; that when in compliance with a request of the committee which called upon him for information as to the averment in his report that it was based upon statements of naval officers and other persons of intelligence, and for the transmission of all the documents in the possession of the department relating to the subject, he willfully suppressed important papers, and when again called upon by the same committee to send those papers, he still refused to comply; and that his conduct throughout the whole transaction was reprehensible ; and in unmeasured terms of censure he is charged with almost ■evei’y offence of the official decalogue.
The first reply to this exceptional claim for relief is, that this is not a tribunal to sit in judgment on erroneous improper acts of' public officials. If such officer is still in power, he may be removed by impeachment; and if not, and he has acted corruptly, he is subject to indictment and punishment. But in behalf of my colleagues and myself, I take great pleasure in saying that not one word of all this labored attack upon this distinguished officer has produced in our *544 minds the slightest suspicion that his action from beginning to end in the matter was not honorable and wise and patriotic. This gentleman, before he became Secretary of the Navy, was, as we know, a judge of an important court of the United States, where he discharged his responsible duties to-the satisfaction of the Government and the suitors. ' By President Garfield he was appointed to the post of Secretary of the Navy, from which he was transferred by President Arthur to one of the most responsible diplomatic stations in the gift of the Government; and he is now absent from the-place of this attack, as the representative of the United States, representing his Government with general acceptance. We have no idea of, attaching one breath of censure to his official acts upon any such ex parte statements, founded,, we are bound to believe, in the most favorable view, on prejudice and misinformation. And so far from believing that there exists any ground for reprehension in his conduct in this matter, we are satisfied he deserves the thanks of the country for what he did. There is nothing in this personal’, attack that changes our opinion that the petition should be-dismissed ; and it is dismissed accordingly with costs.